853 So.2d 396 (2003)
Richard McCOY, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-2113.
Supreme Court of Florida.
August 21, 2003.
*399 Lester Makofka of Makofka & Makofka, Jacksonville, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution.

Facts and Procedural History
On the morning of June 13, 2000, Shervie Ann Elliott was found dead in the storage room of the Jacksonville ABC Liquors store in which she worked, and $415 was missing from the store's two safes. The evidence adduced at the appellant's trial established that the victim had been shot once in the abdomen, a wound which disabled her; once in the neck, resulting in paralysis; and once in the face, the fatal wound. The store's surveillance tape showed the robbery and murder occurring from 8:20 a.m. to 8:33 a.m. on June 13. The initial investigation of the alcoholic beverage store performed by law enforcement officers and evidence technicians revealed no evidence of a physical struggle.
Both circumstantial and direct evidence linked the appellant to the crime scene. Three latent fingerprints found on an ABC Liquors cash and receipt pouch within the non-public store office were matched to McCoy. While the latent fingerprint examiner could not form any conclusions regarding when the fingerprints were deposited on the pouch, ABC Liquors employees testified that the money pouches were kept within the store office at all times, and only store managers were involved with the pouches. Additionally, the store surveillance camera revealed that an African-American male had committed the robbery and murder.
On June 19, ABC Liquors advertised a $10,000 reward for information leading to the arrest and conviction of the person who had robbed and murdered Elliott. The following day, Zsa Zsa Marcel contacted ABC Liquors and spoke with Teresa Johnson, the ABC Liquors regional manager for the Jacksonville area. Johnson directed Marcel to Dale Galbreath, the detective leading the Sheriff's Office investigation of the robbery and murder. She related to Galbreath that on June 14, her boyfriend,[1] Richard McCoy,[2] had told her that he had been involved in the armed robbery of an ABC Liquors store in which a woman was killed. He had detailed to Marcel the manner in which he and his accomplice "rushed" the manager of the store as she opened the back door, forced her to turn off the alarm and video surveillance equipment, and made Elliott open the store's safes. Additionally, McCoy had told Marcel that the inside of the store was very dimly lit at the time of the robbery, his accomplice had actually shot the store manager, and he and his partner had netted $4,000 from the venture.
Following her discussion with Galbreath, Marcel agreed to initiate a conversation with McCoy regarding the ABC Liquors robbery while wearing a recording device attached to her purse. Subsequently, she listened to the tape recording of her conversation with McCoy, agreed that it was a *400 fair and accurate depiction of their discussion that afternoon, and helped the State prepare a transcript of the conversation.
On July 13, 2000, McCoy was indicted by a Duval County grand jury on charges of first-degree murder, armed burglary, and armed robbery.[3] In addition to the testimony of Marcel, the ABC Liquors employees, and law enforcement officers related above, McCoy's trial jury heard testimony during the guilt phase from the medical examiner, detailing the succession of the gunshot injuries sustained by Elliott, as well as her conclusion that the second and third gunshots fired by Elliott's attacker had been fired from a distance of between six and twelve inches from the victim's body.
Following the trial court's denial of McCoy's motion for judgment of acquittal, the defense presented evidence in support of the appellant's claim that he was at the home of his girlfriend, Dorothy Small, on the morning of June 13, 2000. Sherry Cross, Small's neighbor and a Raven Transport long-haul truck driver, testified that she had spoken with McCoy for approximately five minutes outside her home on the morning of the thirteenth between 8:00 a.m. and 8:30 a.m. On cross examination, however, she admitted that she was estimating, and that the conversation could have taken place either after 8:30 a.m., or before 8 a.m. Cross's testimony was supported by the testimony of the Raven Transport Director of Safety, William Weise, who testified that the company's satellite positioning system showed that Cross was in Jacksonville on the morning of June 13. Additionally, the defense presented the testimony of Dorothy Small, who related that after spending the night at her house, McCoy had left her home early on the morning of the 13th of June, and John Bailey, a Krystal Burger employee who testified that McCoy ate breakfast at his restaurant nearly every morning. Bailey could not, however, remember whether McCoy ate breakfast at Krystal Burger on the morning of June 13. The defense then called Clarence Williams, the father of a child with Zsa Zsa Marcel, who testified that Marcel had a reputation for dishonesty in their Louisiana community.
Finally, McCoy testified in his own defense. He testified that on the morning of June 13, 2000, he left Small's house at 6:45 a.m. and went home. He returned to Small's house at around 8 a.m. to take trash to the curb, and spoke with Cross at that time. After completion of this chore, McCoy went to Krystal Burger, ate breakfast, and then proceeded to an interview. He and Marcel had a relationship, and he knew that she was "tough"she had confessed to him that she robbed a restaurant on June 10. McCoy testified that, therefore, he lied to her and claimed that he had robbed ABC Liquors, in an effort to impress her. He explained that his fingerprints were on the ABC Liquors receipt pouch because he had once found one of the pouches in another ABC store parking lot, and mailed it to ABC Liquors headquarters in Orlando.
In rebuttal, the State presented the testimony of Mark Bachara, a Jacksonville Sheriff's Office investigator assigned to the Office of the State Attorney, who stated that it takes six minutes to drive from Dorothy Small's home to the ABC Liquors store that was robbed on June 13, 2000. Following a renewed motion for judgment of acquittal, closing argument, and jury instruction, the jury found McCoy guilty of *401 premeditated first-degree murder. Additionally, the jury specifically found that "the killing was done during the commission or attempted commission of a robbery."
The State's presentation during the penalty phase consisted of the introduction of judgments and sentences detailing McCoy's prior convictions for three counts of armed robbery and one count of attempted armed robbery. Additionally, the State elicited testimony from Richard Hughes, McCoy's probation supervisor, to establish that the appellant was being supervised on conditional release at the time of the ABC Liquors robbery. Finally, the victim's sister and the victim's ABC Liquors supervisor testified regarding the impact of the victim's death upon their lives, and a statement written by the victim's son was read to the jury.
The defense presented the testimony of McCoy's mother and sisters, who detailed for the jury the troubled home life to which McCoy was exposedphysical abuse, inter-parental violence, and nearly abject poverty. Paul Gillians, Diane Peterson, and Trina Rivers testified regarding McCoy's respectful and caring nature, as well as instances in which he had performed good deeds, including his saving Paul Gillians from being burned to death. McCoy waived his right to testify during the penalty phase, and, following instruction and deliberation, the jury recommended imposition of the death penalty by a vote of seven to five.
The court held a subsequent Spencer[4] hearing, and followed the jury's recommendation, concluding that "on balance, the aggravating circumstances in this case far outweigh the mitigating circumstances." The trial court concluded that the following aggravators applied: (1) prior conviction of felonies involving the use or threat of violence; (2) the appellant was under a sentence of imprisonment or on community control at the time of the commission of the instant murder; (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); (4) the murder was committed for financial gain and was committed while engaged in the commission of the crime of armed robbery (aggravators merged); and (5) the murder was committed for the purpose of avoiding or preventing a lawful arrest (merged with CCP aggravator). The court found no statutory mitigators, but determined that twenty mitigating circumstances had been established.[5] Each *402 of the mitigating factors was given "some weight" by the trial court.
McCoy now appeals, asserting seven issues.[6]

Analysis
In his first two claims,[7] the appellant contends that the audiotape of the conversation between McCoy and Marcel, to which the jury listened, was so entirely inaudible that the trial court erred in admitting the recording into evidence. Additionally, McCoy asserts that the court below improperly allowed the State to use a transcript of this Marcel-McCoy conversation as a demonstrative aid at trial. Prior to trial, the defense entered a motion seeking to prohibit the use of the audiotape and transcript at trial, on the basis that the significant inaudible portions of the recording rendered it inadmissable, and that the transcript did not accurately reflect the recorded conversation. The trial court listened to the tape and reviewed the transcript on the record, and stated:
[C]onsistent with the court's decision in Martinez versus State, at least the relevant portions of the tape are sufficiently audible.
That they would be of benefit to the trier of fact.
And that the inaudible portions do not make the tape fully useless or inadmissible or confusing.
You can, of course, argue that the transcript is not accurate and ask the jurors to be bound by what they hear on the tape rather than what is in the transcript. And I would expect you to do that.
And I would instruct the jury, if you are going to let them use the transcript, that the transcript is not evidence. It's simply one listener's interpretation. That the jury should be bound by what they hear themselves.
....
With that being made, the tape is for the most part audible and therefore for the most part admissible.
Additionally, following its review of the transcript, the court required the State to make certain changes to the document, to ensure that it accurately tracked the contents of the recording:
There are places obviously where things are being said where the transcript doesn't make a reference to inaudible words being spoken.
If you intend to use the transcript as a demonstrative aid for the jury you need to go back and add those parenthetical inaudibles to the transcript. And there are several. I agree with [defense counsel] Mr. Chipperfield. I agree there are several.
*403 At trial, the court was presented with evidence authenticating the transcript, in the form of testimony from Marcel:
Q: Have you had an opportunity to hear the tape of your conversation with the defendant?
A: Yes.
Q: Is the tape a fair and accurate depiction of your conversation with the defendant?
A: Yes.
Q: Does that tape cover your conversation with the defendant from beginning to end?
A: Yes.
Q: Did you later help prepare a transcript of the tape?
A: Yes, I did.
While the State never elicited precise testimony from Marcel that the transcript fairly and accurately recreated the conversation in print form, the clear implication from this colloquy is that Marcel, a participant in the conversation, helped prepare the transcript, and that the transcript accurately reflected her discussion with McCoy reduced to writing. Additionally, no objection other than the audibility argument presented pretrial was asserted during trial, and the transcript was an aid not admitted into evidence.
As noted by the trial court, the operative law on this issue was expressed by this Court in Martinez v. State, 761 So.2d 1074 (Fla.2000):
The general rule in Florida regarding admissibility of partially inaudible tape recordings is that partial inaudibility or unintelligibility is not a ground for excluding a recording if the audible parts are relevant, authenticated, and otherwise properly admissible. Such recordings are admissible unless the inaudible and unintelligible portions are so substantial as to deprive the audible portions of relevance.
.... [T]he jury may view an accurate transcript of an admitted tape recording as an aid in understanding the tape so long as the unadmitted transcript does not go back to the jury room or become a focal point of the trial.
Id. at 1083 (citations, emphasis, and internal quotation marks omitted). Additionally, Martinez provided the following guidance regarding proper procedure in addressing proffered transcripts:
[T]rial courts should exercise extreme caution before allowing transcripts of recordings to be viewed by the jury. The preferred approach is for the parties to stipulate to the accuracy of the transcript. If there is a dispute as to the accuracy, the trial court should make an independent pretrial determination of the accuracy of the transcript after hearing from persons who can properly testify as to its accuracy.
....
In addition, ... where a transcribed version of an audio-video tape is used as an aid to the jury and there is no stipulation as to its accuracy, trial courts should give a cautionary instruction to the jury regarding the limited use to be made of the transcript.
Id. at 1086 (citations omitted).
Here, the trial judge satisfied and followed the Martinez elements. McCoy does not contend that the contents of the audiotape were not relevant to the issues before the jury. Indeed, it is beyond question that a recording of a conversation in which the defendant relates non-public details of his crime is extraordinarily relevant. Additionally, the tape recording at issue in the instant case was properly authenticated by one of the participants in the discussionZsa Zsa Marcel. The audiotape was "properly authenticated by a *404 person having personal knowledge of the contents of the tape recording." Harris v. State, 619 So.2d 340, 342 (Fla. 1st DCA 1993). Nothing more than this confirmation, by a participant in the conversation, that the tape fairly and accurately memorialized the discussion at issue is required to properly authenticate the recording. See Charles W. Ehrhardt, Florida Evidence § 401.4 (2002 ed.). Additionally, no other provision of the rules of evidence casts doubt upon the admissibility of the recording at issue in the instant case.
Our review of the audiotape itself reveals that the instant case is one of "substantial audibility," not one in which the inaudible portions of the tape "are so substantial to deprive the remainder of relevance." Holland v. State, 773 So.2d 1065, 1073 (Fla.2000); see also Springer v. State, 429 So.2d 808, 808 (Fla. 4th DCA 1983); Carter v. State, 254 So.2d 230, 231 (Fla. 1st DCA 1971). There exist inaudible portions of the tape; however, significant parts of the recording are very clear. A court's evaluation of partially inaudible recordings must be guided by the principle that an audiotape should be admitted into evidence unless the condition of the recording degrades its usefulness to such an extent that it makes the evidence misleading or irrelevant. The trial court's factual determination that the tape was "for the most part audible" is supported by competent, substantial evidence, and in admitting the tape, the court properly applied the law governing admission of partially inaudible audiotapes to the facts. See State v. Glatzmayer, 789 So.2d 297, 301 n. 7 (Fla. 2001) ("If the ruling consists of a mixed question of law and fact ... the ruling must be sustained if the trial court applied the right rule of law and its ruling is supported by competent substantial evidence.").
With regard to the transcript, the trial court followed the guidance of Martinez almost precisely. During a pretrial hearing, the trial court listened to the audio recording itself, and compared what it heard to the State's proffered transcript. As noted above, following its review of the transcript, the court required the State to make certain changes to the document, to ensure that it accurately reflected the actual conversation on the recording:
There are places obviously where things are being said where the transcript doesn't make a reference to inaudible words being spoken.
If you intend to use the transcript as a demonstrative aid for the jury you need to go back and add those parenthetical inaudibles to the transcript. And there are several. I agree with [defense counsel] Mr. Chipperfield. I agree there are several.
Certainly, this qualifies as "an independent pretrial determination of the accuracy of the transcript." Martinez, 761 So.2d at 1086. This determination by the trial court, coupled with later testimony by Marcel regarding the accuracy of the transcript, qualified the document for use as a demonstrative aid.[8]
Prior to the publishing of the recording to the jury and concomitant distribution of the State's transcript, the court gave the following cautionary instruction:
Members of the jury, the transcript itself is being prepared to assist you in understanding what is being stated on the tape, but the evidence in the case is *405 the audible part that you will be listening to in just a few moments on the tape itself.
The transcript is a demonstrative aid and represents in part the state attorney's efforts to transcribe it, but the transcript itself is not what's in evidence. It is the tape that's in evidence and it's the tape that you are to consider, and what you hear from the tape is what you are to consider as evidence in the case.
Again, the trial court followed the mandate of Martinez, and instructed the jury regarding the proper use of a transcript.[9]
A cursory review of the cautionary instruction given by the trial court reveals that McCoy's assertion that the trial court improperly bolstered the transcript in some fashion is absolutely devoid of merit. The court properly related to the jury that only the audiotape was evidence, and the transcript was merely an aid to assist their understanding thereof, which was not to be considered during their deliberations regarding guilt. The instruction was entirely appropriate, and does not constitute reversible error.
It is well settled that the use of "demonstrative devices to aid the jury's comprehension is well within the court's discretion." United States v. Possick, 849 F.2d 332, 339 (8th Cir.1988); see also Hunt v. State, 746 So.2d 559, 561-62 (Fla. 1st DCA 1999). Accordingly, the court's distribution of the transcript to the jury cannot be characterized as an arbitrary or fanciful action which "no reasonable person would take." White v. State, 817 So.2d 799, 806 (Fla.2002). Indeed, as a matter of law, the trial court's treatment of the transcript and recording here was entirely proper without regard to the standard to be utilized to evaluate the trial court's action.
It is clear that the trial court scrupulously followed the guidance promulgated by this Court in Martinez, and we commend the court below for its fair and reasoned approach to the issues surrounding the audiotape and transcript at issue here. Indeed, we explicitly reaffirm our commitment to the guidance of Martinez, and, with the issuance of this opinion, mandate that trial courts make an independent pretrial determination of the accuracy of transcripts, and give a cautionary instruction to the jury regarding the limited use to be made of the transcript, prior to employment of these demonstrative aids during trial. Because the trial court below did precisely this, McCoy's claims of error fail.
McCoy also takes issue with the trial court's treatment of the testimony of the state's primary witness, Zsa Zsa Marcel. As an initial matter, the appellant's contention that Marcel was entirely incompetent to testify, due to the ABC Liquors reward in this case, is entirely without merit. As we stated in Rutherford v. Moore, 774 So.2d 637 (Fla.2000):
A witness is incompetent to testify if the trial court determines the witness is (1) unable to communicate to the jury; (2) unable to understand the duty to tell the truth; or (3) unable to perceive and remember events. However, "[a] witness is presumed competent to testify until the contrary is established." *406 Id. at 646 (citations omitted) (quoting Hawk v. State, 718 So.2d 159, 162 (Fla. 1998)); see also Charles W. Ehrhardt, Florida Evidence § 601.1 (2002 ed.) ("All witnesses are presumed to be competent."). Thus, as a matter of law, Marcel was competent to testify in the trial below.
The appellant asserts that the trial court improperly limited his cross-examination of Marcel regarding her putative involvement in a restaurant robbery, as well as her behavior with regard to the telephone account of McCoy's father. First, our examination of the record reveals that the trial court never prohibited the defense from cross-examining Marcel on the subject of her putative Lee's Chicken robbery. In fact, the trial court only disallowed cross-examination on the subject during Marcel's testimony for the State, and then only because no evidentiary predicate on the matter had yet been established by the defense. At that time, the trial court explicitly advised the defense as follows:
I understand what you are doing. My concern is what if we go through all of this great exercise and we put her [Marcel] on trial for the armed robbery and we have all the people testify and all that kind of stuff and your client decides he doesn't want to testify what have we done at that point?
....
We have created a mistrial because we have introduced gobs of totally irrelevant and very damaging evidence for the state that is totally irrelevant because there is at that point no evidence that she told him about it [the restaurant robbery].
....
So I have this suspicion that if you are entitled to put this on at all you would only be entitled to put it on in your case and only then after you have had him [McCoy] testify that she [Marcel] confessed this to him which then makes it become relevant.
I have no problem with making her come back for you to continue your cross examination of her after it is a matter of record that it is relevant, but I am not inclined to let alllet this secondary trial go on unless and until it becomes record evidence that he [McCoy] knew about it and that she [Marcel] knew anything about it.
The defense did not pursue the matter further during its case-in-chief, other than submitting the testimony of McCoy relating that Marcel had confessed to him her involvement in an armed robbery of Lee's Chicken. Clearly, the trial court did not limit cross-examination of Marcel as to this issue; therefore, no relief is warranted.
The trial court did prohibit testimony and cross-examination regarding the assertion that Marcel had charged hundreds of dollars of telephone calls to the telephone account registered to McCoy's father, granting the State's pretrial motion in limine to limit such evidence. Our standard of review with regard to trial court rulings on the proper scope of cross-examination is clear: "Limitation of cross-examination is subject to an abuse of discretion standard." Moore v. State, 701 So.2d 545, 549 (Fla.1997); see also Winner v. Sharp, 43 So.2d 634, 635 (Fla.1949) ("The admission or rejection of impeaching testimony is within the sound discretion of the trial court."); Lewis v. State, 754 So.2d 897, 901 (Fla. 1st DCA 2000). Thus, unless the trial court abused its discretion, which is guided and informed by applicable precedent, this Court will not disturb the judgment below.
The appellant's contentions regarding the trial court's prohibition against cross-examination of Marcel with *407 respect to her supposed telephone account abuses are wholly without merit. While it is true that "[a] defendant should be afforded wide latitude in demonstrating bias or possible motive on the part of a witness," Henry v. State, 688 So.2d 963, 966 (Fla. 1st DCA 1997), any questioning on the subject of this uncommonly extraneous issue would have been improper. Indeed, when analyzing a similar claim of improper restriction of cross-examination, this Court succinctly stated, "[E]vidence of particular acts of ethical misconduct cannot be introduced to impeach the credibility of a witness. The only proper inquiry into a witness's character for impeachment purposes goes to the witness's reputation for truth and veracity." Fernandez v. State, 730 So.2d 277, 282 (Fla.1999); see also Baker v. State, 804 So.2d 564, 567 (Fla. 1st DCA 2002) (holding that "other than evidence of prior convictions ... credibility may not be attacked by proof that the witness has committed specific acts of misconduct"). Certainly, the trial court did not abuse its broad discretion when it made the following conclusions:
I am going to find that the evidence that has been explained to me is not admissible impeachment evidence under 90.608 through 610 because it does not demonstrate bias towards the defendant. It may show an effort to stick his father with some phone costs if in fact it shows that at all. But thatI cannot make a leap of faith from that to show some animosity or bias or prejudice towards the defendant.
We agree with the trial court. Evidence of Marcel's misuse of the appellant's father's telephone account was entirely irrelevant to the issues before the jury. The trial court's decision was entirely proper.
McCoy next contends that the trial court's application of the cold, calculated, and premeditated aggravating factor was improper in the instant case. This Court recently reiterated the operative standard of review in examining the application of aggravating circumstances: "[A] trial court's ruling on an aggravating circumstance will be sustained on review so long as the court applied the right rule of law and its ruling is supported by competent substantial evidence in the record." Dennis v. State, 817 So.2d 741, 765-66 (Fla.2002) (quoting Gore v. State, 784 So.2d 418, 432 (Fla.2001)), cert. denied, 537 U.S. 1051, 123 S.Ct. 604, 154 L.Ed.2d 527 (2002). Additionally, "[c]ompetent substantial evidence is tantamount to legally sufficient evidence, and [this Court] assess[es] the record evidence for its sufficiency only, not its weight." Almeida v. State, 748 So.2d 922, 932 (Fla.1999).
Legally sufficient evidence exists in the record on appeal to support the trial court's application of the CCP aggravator. As noted by the trial court, the video surveillance tape, when considered in conjunction with the medical examiner's testimony, demonstrates advance procurement of the murder weapon, absolutely no resistance or provocation on the part of the victim, and a killing carried out as a matter of course. See Farina v. State, 801 So.2d 44, 54 (Fla.2001), cert. denied, 536 U.S. 910, 122 S.Ct. 2369, 153 L.Ed.2d 189 (2002); Bell v. State, 699 So.2d 674, 677 (Fla.1997). McCoy methodically guided the victim throughout the ABC Liquors store, attempting to turn off the alarm and surveillance taping devices, and obtaining all of the cash within the establishment. He then forced Elliott into a storage rooma place which held no money or valuables for him to obtain. There, he shot the victim once in the abdomen to disable her, once in the upper neck or lower head to paralyze her, and once in the face, killing her. The final two shots were fired from between six and twelve inches away.
*408 The appellant's actions were properly deemed cold, calculated, and premeditated by the trial court. Indeed, the instant case is an example of the "deliberate ruthlessness" for which application of this aggravating factor is reserved. See Zack v. State, 753 So.2d 9, 21 (Fla.2000); Jennings v. State, 718 So.2d 144, 152 (Fla.1998). There were no signs of physical struggle at the crime scene, and the appellant had ample opportunity to leave ABC Liquors after completing the robbery. However, he considered his options, and unnecessarily executed a compliant hostage. Application of the CCP aggravating circumstance is proper. See Looney v. State, 803 So.2d 656, 678 (Fla.2001) (applying CCP where "the defendants had ample opportunity to reflect upon their actions, following which they mutually decided to shoot the victims execution-style"), cert. denied, 536 U.S. 966, 122 S.Ct. 2678, 153 L.Ed.2d 850 (2002); Alston v. State, 723 So.2d 148, 162 (Fla.1998) (sustaining the CCP aggravator where the "appellant had ample opportunity to release [the victim] after the robbery," but chose to kill him); Eutzy v. State, 458 So.2d 755, 757 (Fla.1984) (sustaining CCP where there was no sign of struggle, yet the victim was shot execution-style).
We have reviewed the record on appeal and conclude that the trial court did not err in denying McCoy's motions for judgment of acquittal. The State introduced substantial evidence demonstrating the appellant's guilt in the instant case, and successfully rebutted McCoy's hypothesis of innocence. Correlatively, "after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Bradley v. State, 787 So.2d 732, 738 (Fla.2001). The record contains sufficient evidence to support McCoy's conviction for first-degree murder.
While not raised by McCoy, this Court is constitutionally charged with review of his sentence for proportionality. "Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review." Bryant v. State, 785 So.2d 422, 436 (Fla.2001). This review is a "unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law." Tillman v. State, 591 So.2d 167, 169 (Fla.1992). "It is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a `thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases.'" Beasley v. State, 774 So.2d 649, 673 (Fla. 2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)).
In the instant case, four aggravating circumstances apply: (1) prior conviction of felonies involving the use or threat of violence;[10] (2) appellant was under a sentence of imprisonment when he committed the instant murder; (3) CCP; and (4) the murder was committed for financial gain and was committed while engaged in the commission of the crime of armed robbery (aggravators merged).[11] The trial court found twenty mitigating circumstances, giving each "some weight."
While it is clear that the instant case may not be the most vicious or outrageous of murders reported in Florida, application *409 of the death penalty is certainly not disproportionate here. This Court has previously noted the "particular weight" of the prior violent felony aggravator. See Ocha v. State, 826 So.2d 956, 966 (Fla.2002). Likewise, it is well settled that CCP is "one of the `most serious' aggravators in the sentencing scheme." Pagan v. State, 830 So.2d 792, 817 (Fla.2002) (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)), cert. denied, ___ U.S. ___, 123 S.Ct. 2278, 156 L.Ed.2d 137 (2003). This Court has upheld application of the death penalty in cases involving less aggravation, and more evidence in mitigation. See, e.g., Pagan, 830 So.2d at 815-17 (affirming death sentence where prior violent felony, murder committed while in the course of an armed robbery, and CCP aggravators applied and numerous mitigating circumstances existed); Pope v. State, 679 So.2d 710 (Fla. 1996) (holding death penalty proportionate where two aggravating factors, murder committed for pecuniary gain and prior violent felony, outweighed two statutory mitigating circumstances, commission while under influence of extreme mental or emotional disturbance and impaired capacity to appreciate criminality of conduct, and several nonstatutory mitigating circumstances); Melton v. State, 638 So.2d 927 (Fla.1994) (holding death penalty proportionate where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed moderate nonstatutory mitigation); Heath v. State, 648 So.2d 660 (Fla.1994) (affirming defendant's death sentence based on presence of two aggravating factors of prior violent felony and murder committed during course of robbery, despite the existence of the statutory mitigator of extreme mental or emotional disturbance). Given the evidence in aggravation and mitigation in the instant case, the appellant's sentence is proportionate.
Finally, McCoy contends that Florida's death penalty scheme is unconstitutional on a variety of grounds. Having examined his assertions, we conclude that each of them has failed in previous cases before this Court, and McCoy advances no basis to justify revisiting settled jurisprudence. Of note, McCoy has asserted that Florida's capital sentencing scheme violates both the United States and Florida Constitutions under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. We conclude that McCoy is likewise not entitled to relief on this claim. Additionally, with regard to aggravating factors, a jury unanimously found McCoy guilty of armed robbery here, and it is undisputed that he was previously convicted of violent felonies and was under a sentence of imprisonment at the time of the instant murder.

Conclusion
In accordance with the above analysis, we hold that the appellant has not presented any legal basis upon which we may set aside his judgment or sentence of death. We affirm the decision of the court below.
It is so ordered.
PARIENTE, QUINCE, CANTERO and BELL, JJ., concur.
WELLS and LEWIS, JJ., concur in result only.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects except for the discussion of Ring *410 v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
NOTES
[1] Marcel was married to a different man throughout the relationship she had with McCoy.
[2] McCoy is also known as Jamil Rashid, the name he adopted upon Islamic conversion. For ease of presentation, we refer only to the appellant's birth name, Richard McCoy.
[3] As McCoy does not contest his armed robbery conviction, and was not convicted of armed burglary, we address only the appellant's conviction and sentence for first-degree murder.
[4] Spencer v. State, 615 So.2d 688 (Fla.1993).
[5] (1) The defendant suffered an abusive childhood; (2) the defendant suffered an emotionally deprived childhood; (3) the defendant suffered an economically deprived childhood; (4) the defendant's mother had relationships with different abusive and non-abusive males; (5) the defendant suffered from unstable living conditions in his childhood; (6) the defendant's parents' divorce at age ten devastated him; (7) the defendant received poor and inadequate medical care, particularly when he suffered from a high fever; (8) the defendant is a caring son to his mother, providing her food, renting movies for her, and spending time with her; (9) the defendant had a good relationship with his father; (10) the defendant was a caring brother to his sisters, Barbara McCoy and Dorothy McCoy Robertson; (11) the defendant was a caring parent, before his incarceration, to his two sons, Andre (age 17) and Kenny (age 15); (12) as a child, the defendant did poorly in school; (13) as a child, the defendant did not receive the psychological counseling recommended by school officials; (14) there is no evidence that the defendant has ever been violent or abusive in his personal relationships with family members or friends; (15) the defendant is a member of the Muslim faith; (16) the defendant successfully held employment as a welder; (17) the defendant performed laudable humanitarian deeds for Paul Gillians, Diane Peterson, and Trina Rivers; (18) the defendant demonstrated good behavior during the trial after the verdict was rendered; (19) for the eleven months that he was on conditional release prior to the commission of this robbery and murder, the defendant apparently did well and complied with the requirements of conditional release; and (20) the defendant would die in prison regardless of the sentence imposed.
[6] The appellant contends that the trial court erred in (1) admitting the audiotape conversation between McCoy and Marcel into evidence; (2) permitting the jury to view a transcript of the conversation between McCoy and Marcel; (3) denying McCoy's motions for judgment of acquittal made at the close of the State's case, as well as at the close of the evidence; (4) allowing Marcel to testify; (5) restricting the cross-examination of Marcel; and (6) finding that the instant murder was committed in a cold, calculated, and premeditated fashion. Finally, McCoy asserts that (7) the Florida death penalty scheme is unconstitutional.
[7] While the appellant chose to present these claims separately, we conclude that they are interrelated, and thus address them together.
[8] Because the transcript was used as a demonstrative aid and not introduced as evidence, separate and technical authentication in the traditional sense under the rules of evidence was not independently necessary at trial. Additionally, no argument regarding authentication of the transcript was ever asserted below.
[9] It is worth noting that the instruction given to the jury below regarding the proper role of a transcript as a demonstrative aid is quite similar to the language of the instruction specifically approved in Martinez, as well as the standard jury instruction adopted subsequent to the trial proceedings in this case. See Martinez, 761 So.2d at 1086 (quoting Macht v. State, 642 So.2d 1137, 1138 (Fla. 4th DCA 1994)); Fla. Std. Jury Instr. (Crim.) 2.6.
[10] The prior violent felony convictions found by the court below were three counts of armed robbery in 1985, and one count of attempted armed robbery in 1989.
[11] As noted earlier, the trial court merged a fifth aggravator, committed for the purpose of avoiding or preventing a lawful arrest, with the CCP aggravating factor.