PER CURIAM.
Richard McCoy appeals an order that denied his motion to vacate a judgment of conviction of first-degree murder and a' sentence of death under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
FACTS AND PROCEDURAL HISTORY
A jury convicted McCoy of the first-degree murder of Shervie Ann Elliott and recommended the death penalty by a vote of seven to five. See McCoy v. State, 853 So.2d 396, 400-01 n. 3 (Fla.2003). Following that recommendation, the trial court sentenced McCoy to death for the murder. Id. In the opinion affirming the conviction and sentence, this Court detailed the facts of the murder and the subsequent trial:
On the morning of June 13, 2000, Shervie Ann Elliott was found dead in the storage room of the Jacksonville ABC Liquors store in which she worked, and $415 was missing from the store’s two safes. The evidence adduced at the appellant’s trial established that the victim had been shot once in the abdomen, a wound which disabled her; once in the neck, resulting in paralysis; and once in the face, the fatal wound. The store’s surveillance tape showed the robbery and murder occurring from 8:20 a.m. to 8:33 a.m. on June 13. The initial investigation of the alcoholic beverage store performed by law enforcement officers and evidence technicians revealed no evidence of a physical struggle.
Both circumstantial and direct evidence linked the appellant to the crime scene. Three latent fingerprints found on an ABC Liquors cash and receipt pouch within the non-public store office were matched to McCoy. While the latent fingerprint examiner could not form any conclusions regarding when the fingerprints were deposited on the pouch, ABC Liquors employees testified that the money pouches were kept within the store office at all times, and only store managers were involved with the pouches. Additionally, the store surveillance camera revealed that an African-American male had committed the robbery and murder.
On June 19, ABC Liquors advertised a $10,000 reward for information leading to the arrest and conviction of the person who had robbed and murdered El *704 liott. The following day, Zsa Zsa Marcel contacted ABC Liquors and spoke with Teresa Johnson, the ABC Liquors regional manager for the Jacksonville area. Johnson directed Marcel to Dale Gilbreath, the detective leading the Sheriffs Office investigation of the robbery and murder. She related to Gil-breath that on June 14, her boyfriend,[n,1] Richard McCoy,[”-2] had told her that he had been involved in the armed robbery of an ABC Liquors store in which a woman was killed. He had detailed to Marcel the manner in which he and his accomplice “rushed” the manager of the store as she opened the back door ... and made Elliott open the store’s safes. Additionally, McCoy had told Marcel that the inside of the store was very dimly lit at the time of the robbery, his accomplice had actually shot the store manager, and he and his partner had netted $4,000 from the venture.
[N.1.] Marcel was married to a different man throughout the relationship she had with McCoy.
[N.2.] McCoy is also known as Jamil Rash-id, the name he adopted upon Islamic conversion. For ease of presentation, we refer only to the appellant's birth name, Richard McCoy.
Following her discussion with Gil-breath, Marcel agreed to initiate a conversation with McCoy regarding the ABC Liquors robbery while wearing a recording device.... Subsequently, she listened to the tape recording of her conversation with McCoy, agreed that it was a fair and accurate depiction of their discussion ... and helped the State prepare a transcript of the conversation.
On July 13, 2000, McCoy was indicted by a Duval County grand jury on charges of first-degree murder, armed burglary, and armed robbery.1"-33 In addition to the testimony of Marcel, the ABC Liquors employees, and law enforcement officers related above, McCoy’s trial jury heard testimony during the guilt phase from the medical examiner, detailing the succession of the gunshot injuries sustained by Elliott. ...
[N.3.] As McCoy does not contest his armed robbery conviction, and was not convicted of armed burglary, we address only the appellant's conviction and sentence for first-degree murder.
Following the trial court’s denial of McCoy’s motion for judgment of acquittal, the defense presented evidence in support of the appellant’s claim that he was at the home of his girlfriend, Dorothy Small, on the morning of June 13, 2000. Sherry Cross, Small’s neighbor and a Raven Transport long-haul truck driver, testified that she had spoken with McCoy for approximately five minutes outside her home on the morning of the thirteenth between 8:00 a.m. and 8:30 a.m. On cross examination, however, she admitted that she was estimating, and that the conversation could have taken place either after 8:30 a.m., or before 8 a.m. ... Additionally, the defense presented the testimony of Dorothy Small, who related that after spending the night at her house, McCoy had left her home early on the morning of the 13th of June, and John Bailey, a Krystal Burger employee who testified that McCoy ate breakfast at his restaurant nearly every morning. Bailey could not, however, remember whether McCoy ate breakfast at Krystal Burger on the morning of June 13. The defense then called Clarence Williams, the father of a child with Zsa Zsa Marcel, who testified that Marcel had a reputation for dishonesty in their Louisiana community.
Finally, McCoy testified in his own defense. He testified that on the morning of June 13, 2000, he left Small’s house at 6:45 a.m. and went home. He *705 returned to Small’s house at around 8 a.m. to take trash to the curb, and spoke ■with Cross at that time. After completion of this chore, McCoy went to Krystal Burger, ate breakfast, and then proceeded to an interview. He and Marcel had a relationship, and he knew that she was “tough” — she had confessed to him that she robbed a restaurant on June 10. McCoy testified that, therefore, he lied to her and claimed that he had robbed ABC Liquors in an effort to impress her. He explained that his fingerprints were on the ABC Liquors receipt pouch because he had once found one of the pouches in another ABC store parking lot, and mailed it to ABC Liquors headquarters in Orlando.
.... [T]he jury found McCoy guilty of premeditated first-degree murder. Additionally, the jury specifically found that “the killing was done during the commission or attempted commission of a robbery.”
Id. at 399-401.
In imposing the death sentence, the trial court found the following aggravating factors: (1) McCoy had been convicted of prior violent felonies (three counts of armed robbery and one count of attempted armed robbery); (2) McCoy was under a sentence of imprisonment or on community control at the time of the murder; (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); (4) the murder was committed for pecuniary gain and was committed while engaged in the commission of an armed robbery (the trial court merged these aggravating circumstances); and (5) the murder was committed for the purpose of avoiding or preventing a lawful arrest (this aggravating circumstance was merged with CCP). Id. at 401. The court found no statutory mitigators, but determined that the following nonstatutory mitigating circumstances had been established:
(1) The defendant suffered an abusive childhood; (2) the defendant suffered an emotionally deprived childhood; (3) the defendant suffered an economically deprived childhood; (4) the defendant’s mother had relationships with different abusive and non-abusive males; (5) the defendant suffered from unstable living conditions in his childhood; (6) the defendant’s parents’ divorce at age ten devastated him; (7) the defendant received poor and inadequate medical care, particularly when he suffered from a high fever; (8) the defendant is a caring son to his mother, providing her food, renting movies for her, and spending time with her; (9) the defendant had a good relationship with his father; (10) the defendant was a caring brother to his sisters, Barbara McCoy and Dorothy McCoy Robertson; (11) the defendant was a caring parent, before his incarceration, to his two sons, Andre (age 17) and Kenny (age 15); (12) as a child, the defendant did poorly in school; (13) as a child, the defendant did not receive the psychological counseling recommended by school officials; (14) there is no evidence that the defendant has ever been violent or abusive in his personal relationships with family members or friends; (15) the defendant is a member of the Muslim faith; (16) the defendant successfully held employment as a welder; (17) the defendant performed laudable humanitarian deeds for Paul Gillians, Diane Peterson, and Trina Rivers; (18) the defendant demonstrated good behavior during the trial after the verdict was rendered; (19) for the eleven months that he was on conditional release prior to the commission of this robbery and murder, the defendant apparently did well and complied with the requirements of conditional release; and (20) the defendant would die in prison regardless of the sentence imposed. *706 Id. at n. 5. The trial court gave each mitigating .factor “some weight.” Id. at 401-02.
Direct Appeal
On direct appeal, McCoy presented the following issues: (1) the trial court erred when it admitted into evidence the audiotape of the conversation between McCoy and Zsa Zsa Marcel because it was inaudible; (2) the trial court erred when it allowed the State to use a transcript of the recorded conversation between McCoy and Marcel as a demonstrative aid during trial; (3) Marcel was incompetent to testify due to the ABC Liquors reward; (4) the trial court improperly limited McCoy’s cross-examination of Marcel; (5) the trial court erroneously found that CCP had been established; (6) the trial court erred when it denied McCoy’s motions for judgment of acquittal; and (7) Florida’s death penalty structure is unconstitutional. See id. at 402-09. This Court denied relief on all claims and affirmed McCoy’s conviction and sentence of death. Id. at 409.
Postconviction Proceedings
On June 23, 2004, McCoy filed his initial Motion to Vacate Judgment of Conviction and Sentence. McCoy’s Second Amended Initial Motion for Postconviction Relief, the denial of which is currently under review by this Court, was filed on April 20, 2006. The motion presented twenty claims: trial counsel was ineffective for the failure to (1) present key witnesses; (2) use depositions and sworn statements to impeach State witnesses; (3) object to the prosecutor’s comment that the State had predetermined the death penalty is appropriate in this case, and the State engaged in prosecutorial misconduct; (4) develop and present “other perpetrator” evidence; (5) object to the use of both McCoy’s birth name and his new Islamic name; and (6) object to references to religion and McCoy’s unemployment status, as- well as a Golden Rule argument; trial counsel was ineffective for (7) conceding that a robbery had occurred; (8a) allowing Teresa Johnson to testify that $415 was stolen without establishing a foundation as to how the amount had been determined, and (8b) failing to raise a chain of custody claim with regard to the audiotape of the recorded conversation between McCoy and Marcel; the failure to (9a) use an expert court reporter to create an alternate transcription of the recorded conversation, and to offer an opinion as to whether the inaudible portions of the recording were so substantial as to deprive the audible portions of relevance, (9b) use an audio-recording expert to testify as to whether the recording had been altered, and whether the recording could be professionally filtered to render it more audible, and (9c) allege prosecutorial misconduct for presenting the false testimony of Marcel, as well as a transcript of the recorded conversation; (10a) have victims of an unrelated robbery identify Marcel as the perpetrator of that robbery, and (10b) present Marcel as a witness during the defense’s case; (11) advise McCoy about the advantages of not testifying; and (12) present the jury with a chronology of key events during closing statements; (13) the death penalty in Florida is unconstitutionally vague; (14) the death penalty in Florida is unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); trial counsel was ineffective for the failure to (15a) obtain and present store surveillance videotapes and still photos taken of McCoy during the month prior to the murder, and (15b) create and use enlargements of key frames of the surveillance videotape of the actual incident; (16) highlight during closing statements the inconsistencies between McCoy’s “bragging” version of the incident and the actual' facts of the incident; and (17) ensure that store surveillance videotapes were included in the direct appeal record; (18) cumulative *707 error; and trial counsel was ineffective for the failure to (19) object to comments by the prosecutor that denigrated the sentencing role of the jury; and (20)[1] utilize a defense fingerprint expert.
McCoy subsequently filed a supplemental sworn addendum to his second amended initial motion, which presented four additional claims: (SI) the prosecutor failed to establish that McCoy’s fingerprints were left on the ABC Liquors pouch at the time of the murder, and trial counsel was ineffective for failing to adequately challenge the State’s case; under this claim, McCoy also asserted that trial counsel was ineffective for the failure to present the director of safety and security for ABC Liquors as a witness; (S2) the prosecutor violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 76B, 31 L.Ed.2d 104 (1972), when she told the jury during opening statements that (a) the victim was the first person to arrive at the store on the morning of the robbery, (b) McCoy rushed the victim at gunpoint, robbed her, and then murdered her, and (c) fingerprints are not subject to human error or mistakes; under this claim, McCoy also asserted that trial counsel was ineffective for failing to object to these statements; (S3) Florida’s lethal injection protocol violates the Eighth Amendment; and (S4) Florida’s lethal injection protocol violates McCoy’s First Amendment right to free speech.
The postconviction court held a Huff[2] hearing, and determined that an evidentia-ry hearing should be held on claims 1 (in part), 2 (in part), 4-7, 8 (in part), 9-12, 15, 16, 20 (renumbered), and supplemental issues SI and S2. During the evidentiary hearing, McCoy presented the following witnesses: Diana Peterson, a friend of the McCoy family; one of the two prosecuting attorneys from McCoy’s trial; the lead defense attorney during McCoy’s trial; and Zsa Zsa Marcel. McCoy also testified. On October 19, 2010, the postconviction court issued an order that denied all claims presented by McCoy in his second amended initial motion and supplemental addendum.
This review follows.
ANALYSIS
Standard of Review — Ineffective Assistance of Trial Counsel
McCoy’s first five claims on appeal, which are divided into multiple subclaims, challenge the effectiveness of trial counsel. We recently described the requirements to demonstrate ineffective counsel as:
First, counsel’s performance must be shown to be deficient. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Deficient performance in this context means that counsel’s performance fell below the standard guaranteed by the Sixth Amendment. Id. When examining counsel’s performance, an objective standard of reasonableness applies, id. at 688, 104 S-.Ct. 2052 and great deference is given to counsel’s performance. Id. at 689, 104 S.Ct. 2052. The defendant bears the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). This Court has made clear that “[strategic decisions do not constitute ineffective assistance of counsel.” See Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). There is a strong presumption that trial counsel’s performance was not ineffee- *708 tive.' See Strickland, 466 U.S. at 669, 104 S.Ct. 2052.
Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. A defendant must do more than speculate that an error affected the outcome. Id. at 693, 104 S.Ct. 2052. Prejudice is met only if there is a reasonable probability that “but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694, 104 S.Ct. 2052. Both deficient performance and prejudice must be shown. Id. Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
Bradley v. State, 33 So.3d 664, 671-72 (Fla.2010). Further, a court evaluating a claim of ineffectiveness is not required to issue a specific ruling on the performance component of the test when it is evident that the prejudice component is not satisfied. See Ferrell v. State, 29 So.3d 959, 969 (Fla.2010).
Failure to Present “Alibi” Witnesses
In his first claim on appeal, McCoy contends that trial counsel was ineffective for the failure to present the testimony of three witnesses.
Birthday Party Witnesses — McCoy asserts that, if presented during trial, his mother and Diana Peterson, a family friend, would have testified that McCoy was at a birthday party for his sister during the time when Marcel claimed McCoy confessed to her that he participated in the robbery/murder. According to McCoy, this would have damaged Marcel’s credibility and caused the jury to doubt the veracity of her testimony.
It should be noted that both the postcon-viction court’s order and the State’s brief addressing this subclaim rely upon incorrect facts. The postconviction court’s order provides, in part:
Defendant claims that counsel should have presented the testimony of ... Josie McCoy, to show that the Defendant was with her on the evening of the murder. The Defendant claims that this testimony would have undermined Zsa Zsa Marcel’s statement that the Defendant was with her on the evening of the murder, and would have contradicted Ms. Marcel’s testimony that the Defendant confessed to her on that evening. At the time of this conversation, Ms. Marcel and the Defendant were under surveillance by the Jacksonville Sheriffs Office, and this confession was tape recorded.
(Emphasis supplied.) First, this Court’s decision on direct appeal reflects that according to Marcel, McCoy confessed to her the day after the murder, June 14, 2000, the same day that McCoy allegedly attended a birthday party for his sister. See McCoy, 853 So.2d at 399. Second, our decision reflects that Marcel had two conversations with McCoy during which the pair discussed the murder at the ABC Liquors store. The first occurred on the day after the murder, June 14, 2000, and the second, during which Marcel was in possession of a hidden recording device, occurred on June 20, 2000. Id.
Further, in his postconviction motion, McCoy asserted that the testimony of his mother would have impeached Marcel’s assertion that McCoy confessed to her on June H, 2000. In the motion, he stated *709 that Marcel “made a vague claim about [McCoy] being with her in the evening of the day after the murder,” and that his mother could have impeached Marcel with testimony that McCoy was actually at a birthday party from 5 p.m. until 7 p.m. (Emphasis supplied.) Therefore, this claim was not directed to the conversation that occurred on June 20, which was recorded and occurred under police surveillance. Accordingly, the State’s assertion that McCoy’s first claim was without merit because the occurrence of this conversation could have been proven by undercover officers is incorrect. Similarly, to the extent the postconviction court’s denial of this subclaim is based upon the fact that the June 20 conversation was recorded by police, the order is also incorrect. Nonetheless, for the reasons discussed below, this subclaim was properly denied.
During the evidentiary hearing, Diana Peterson testified that on June 14, 2000, she was with McCoy and his mother at a birthday party for McCoy’s sister between 5 p.m. and 7 p.m.[3] However, Peterson also exhibited confusion with regard to dates. When asked during cross-examination what year the birthday party occurred, Peterson replied that she thought it occurred during 2005 or 2006. Peterson also testified that she did not know where McCoy had been before the party or where he went once he left.
Trial counsel admitted that he did not have all of his notes from McCoy’s trial. However, he acknowledged that he spoke with the mother, and she told him that McCoy was with her and other family members on June 14 at a birthday party. Trial counsel explained during cross-examination that he did not present the mother as a witness because he did not believe that her testimony would have assisted McCoy’s defense. Confusion about which conversation the mother’s testimony would have impeached — the June 14 conversation or the June 20 conversation — permeated cross-examination of trial counsel:
STATE: Were you aware that at the time Ms. Marcel was alleged to have had this conversation with your client that was recorded that the two of them were being surveilled by Jacksonville Sheriffs Office personnel?
TRIAL COUNSEL: Yes, I knew.
STATE: So that those people could have identified his voice from the tape as seeing him with Ms. Marcel?
TRIAL COUNSEL: That’s possible, yeah.
STATE: And at anytime did you have doubts about whether or not it was Mr. McCoy’s voice on the tape that you were furnished?
TRIAL COUNSEL: No.
Despite this confusion, McCoy’s claim of ineffectiveness fails because he cannot demonstrate that he was prejudiced by trial counsel’s failure to present his mother or Diana Peterson as witnesses. See generally Ferrell, 29 So.3d at 969 (holding that a court is not required to issue a specific ruling on the performance component of Strickland when it is evident that the prejudice component is not satisfied). The record reflects that their testimonies would not have actually discredited that of Marcel.
The direct appeal record evidences that Marcel fluctuated as to when she saw McCoy on June 14, 2000. In Marcel’s sworn statement, the following discussion occurred:
STATE ATTORNEY: Do you remember about what time of day it was?
MARCEL: It was, like, evening.
*710 STATE ATTORNEY: Was it daylight or was it still—
MARCEL: It was light. It was, like, afternoon.
(Emphasis supplied.) During her deposition, Marcel indicated that she and McCoy met during the evening of June 14, but also noted that she could not designate an exact time:
TRIAL COUNSEL: And what time of the day was it that you were with him?
MARCEL: Evening.
TRIAL COUNSEL: After 6?
MARCEL: Maybe.
TRIAL COUNSEL: And how long do you think you were with him on that day, the day he told you he had hit the ABC?
MARCEL: Maybe three or four hours.
[[Image here]]
TRIAL COUNSEL: Do you have any idea what time it was when you were eating, was it the normal dinner hour?
MARCEL: Well it's like a buffet place so it wasn’t — we didn’t go there actually for dinner. It was just to eat off a buffet. So I don’t know exactly a time.
TRIAL COUNSEL: Was it dark?
MARCEL: No, almost but not dark, no. No, it wasn’t dark.
(Emphasis supplied.) Finally, during trial, Marcel testified that she saw McCoy on the afternoon of June 14, 2000, and they spent three or four hours together.
In none of these prior proceedings did Marcel state that McCoy confessed to her specifically between the hours of 5 p.m. and 7 p.m. — the time of the birthday party. In fact, during her deposition Marcel stated that she could not specify a precise time when she and McCoy were together. Given the vagueness of her statements, and the three-to-four hour timeframe that Marcel asserts she and McCoy were together, the pair could have met on June 14, 2000 at 1 p.m., i.e., before the birthday party, or at 7:30 p.m., i.e., after the birthday party. In support of the latter, the conversation occurred during the summer, and therefore, it would have still been daylight well after 7:30 p.m.
Thus, the mother’s and Diana Peterson’s testimonies with regard to McCoy’s appearance at the birthday party do not actually contradict, nor are they diametrically inconsistent with, Marcel’s sworn statement, her deposition, or her trial testimony as to the time on June 14 that McCoy confessed to her. Indeed, the events of the day can be reconciled such that McCoy both attended his sister’s birthday party and met with Marcel for three to four hours on June 14, 2000. Given this lack of definitive conflict, McCoy cannot satisfy the prejudice prong of Strickland because he has failed to demonstrate “a reasonable probability that ‘but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’” Bradley, 33 So.3d at 672 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Our confidence in the outcome of McCoy’s trial has not been undermined.
Moreover, even if these witnesses had testified, this would not change the fact that Marcel was able to recount specific facts about the robbery that were not public knowledge. Arguably the most compelling fact relayed by Marcel was the following:
[TJhey went to the safe and that they had [the victim] open the safe. [McCoy] said after they opened the safe he told the guy to take the lady in another part of the store. He said as he was getting *711 the money he heard seven gunshots. [McCoy] said he went — when he heard the gunshots he went straight to the VCR to see if they were being recorded. He said the VCR was on pause like it had been paused the night before, and he said that he didn’t think they were being recorded so he left the store.
(Emphasis supplied.) Detective Gilbreath testified that when he entered the store office after the murder he observed a VCR, and the counter display on that VCR was not moving.[4] When asked if it had been released to the media that “one of the surveillance cameras in the store had been put on pause” at the time that Gilbreath spoke with Marcel on June 20, he answered in the negative. Thus, Marcel had knowledge of a very specific detail about the crime before that detail was released to the public. Despite discrepancies between McCoy’s “bragging” description of the robbery/murder and the actual facts of the crime, Marcel’s testimony with regard to this particular detail of the crime scene as it was observed by law enforcement confirms that McCoy was the person who robbed the liquor store and murdered the victim.
In further support of our conclusion that McCoy has failed to demonstrate prejudice is the fact that powerful evidence — independent of Marcel’s testimony of her conversation with McCoy on June 14 — was introduced during trial to establish that McCoy was the perpetrator of the robbery and murder, including the following: (1) a surveillance camera from the ABC Liquors store revealed that an African-American male committed the robbery and murder; (2) during the June 20, 2000 recorded conversation between Marcel and McCoy, he related details of his involvement in the crime; (3) during trial, McCoy admitted that it was his voice on the recording; and (4) although ABC Liquors store pouches were “kept within the store office at all times, and only store managers were involved with the pouches,” three of McCoy’s fingerprints were discovered on a pouch recovered from the crime scene. McCoy, 853 So.2d at 399.
In light of the foregoing, McCoy has failed to satisfy Strickland, and he is not entitled to relief under this subclaim.
ABC Liquors Witness — McCoy next claims that, if presented as a witness, Victor Lynn Williams would have testified that at 8:14 a.m. on the morning of the murder, he was placing garbage in the ABC Liquors store dumpster, and he saw the victim alone in the store parking lot. According to McCoy, this testimony would have contradicted Marcel’s testimony that McCoy and a second perpetrator “rushed” the victim as she opened the back door.
Victor Lynn Williams did not testify during the evidentiary hearing. However, trial counsel provided the following qualified explanation as to why he did not present Williams as a witness:
I don’t have all of my notes where I could figure out whether I even wrote it down. But as I understand it and as I remember it, that dumpster was not in view of the back door where the victim in this case usually entered the business, and he would not have been able to see her at the back door, and I think that the point was whether she — whether anybody else, whether it was one person or two people, or whether he could have *712 seen the person who rushed her at the door.
McCoy has failed to establish under either prong of Strickland that trial counsel was ineffective under this subclaim. First, counsel offered a reasonable explanation with regard to why he did not present Williams as a witness — his testimony would not have refuted that of Marcel because Williams could not see the back of the store from the dumpster. This was a reasonable strategic decision and does not evidence any deficiency on the part of trial counsel. See Occhicone, 768 So.2d at 1048 (noting that “strategic decisions do not constitute ineffective assistance of counsel”).
Although Williams did not testify during the evidentiary hearing, a copy of his deposition was attached to a pro se motion for postconviction relief submitted by McCoy, and this deposition supports trial counsel’s explanation. In his deposition, Williams stated that the dumpster in which he disposed of his garbage was in front of the ABC Liquors store, but during trial, various witnesses testified that the victim entered the store through a door located at the back of the building. Further, although Williams spoke with the victim on the morning of the murder, he departed as she was walking through the parking lot and did not see which door she used to enter the building:
TRIAL COUNSEL: Okay. When you pulled off that morning after you talked with her, were you able to see where she went?
WILLIAMS: She had just got her stuff out of the trunk and she was closing the trunk. And she went around the passenger side and was walking towards the [store].
TRIAL COUNSEL: Did you see what door she went in or did you see her approach a door?
WILLIAMS: No. Because her car is parked far away from the front door. She was just walking across the parking lot.
Because Williams did not see the victim enter the store, nor did he see which door she used, his testimony would not have discredited Marcel’s testimony that McCoy confessed that he and another perpetrator “ ‘rushed’ the manager of the store- as she opened the back door.” McCoy, 853 So.2d at 399.
Additionally, we conclude that McCoy cannot demonstrate prejudice. Williams’ testimony would not have contradicted that of Marcel and, therefore, no reasonable probability exists that, but for trial counsel’s failure to present Williams, the outcome of McCoy’s trial would have been different. Our confidence in the outcome has not been undermined. See Bradley, 33 So.3d at 672 (noting that the prejudice prong of Strickland is satisfied only where a reasonable probability exists that, but for counsel’s deficient performance, the result of the proceeding would have been different. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” (quoting Strickland, 466 U.S. at 694,104 S.Ct. 2052)).
In light of the foregoing, we hold that McCoy is not entitled to relief under his first claim of ineffectiveness.
Religious References
In his second claim, McCoy asserts that trial counsel was ineffective for the failure to object to religious references during voir dire and the penalty phase. While we hold that this claim of ineffectiveness fails, we address two specific challenges by McCoy in detail.
“God Given Common Sense ” — During voir dire, the prosecutor asked the prospective jurors with regard to arriving at a verdict, “Will all of you promise to apply your God given common sense in that deliberation?” Trial counsel did not object to *713 the phrasing of the question. The post-conviction court denied this ineffectiveness subclaim on two bases. First, it noted that McCoy failed to rely upon any legal authority prohibiting the use of the phrase “God given common sense.” Second, the postconviction court found that the phrase was not objectionable and, in fact, noted “in the Jacksonville community, any objection by defense counsel to the State’s mention of ‘God given common sense,’ could have adversely affected the panel’s view of the defense.”
To prevail on an ineffective assistance of counsel claim for failure to object to statements by the prosecution, a defendant “must first show that the comments were improper or objectionable and that there was no tactical reason for failing to object.” Stephens v. State, 975 So.2d 405, 420 (Fla.2007). Here, the postconviction court expressly found that this phrase was not objectionable. McCoy fails to reference a single case which holds that the use of the phrase “God given common sense” by a prosecutor constitutes reversible error, or that a trial attorney’s failure to object to the use of this phrase constitutes deficient performance.
Further, we conclude that trial counsel’s failure to object to the prosecutor’s single, fleeting reference to “God given common sense” did not prejudice the outcome of McCoy’s trial. To the contrary, had trial counsel objected to this phrase, that objection likely would have harmed McCoy’s defense. According to the postconviction court, an objection to a reference to common sense in this fashion would have caused the jury to view the defense negatively. At the time the order denying postconviction relief was signed, the author had served as a judge in Duval County for approximately twenty-two years. It is not unreasonable to conclude that a judge with such extensive service in one community would have a fairly accurate perspective on how its members would react to certain actions by attorneys during a trial. Even McCoy acknowledged in his brief that the Jacksonville community is “very religious.” Thus, although trial counsel did not object to this phrase, the failure to do so actually operated to protect McCoy from a negative perception by the jury and, possibly, prejudice against his defense.
Based on the foregoing, this subclaim of ineffectiveness fails.
Comments by Prospective Juror about Islam — McCoy also contends that trial counsel was ineffective for failure to move to strike the entire venire after one prospective juror made negative comments about Islam. During voir dire, the following dialogue occurred:
TRIAL COUNSEL: [Y]ou said yesterday that you were against the death penalty.
PROSPECTIVE JUROR: Yes, sir.
TRIAL COUNSEL: And I am not going to try to change your mind or anything. I just want to see how strong your feelings are. Can you think of a situation where you could vote for a death sentence for someone convicted of first degree murder?
PROSPECTIVE JUROR: No, sir, not necessarily. Coming into this Court[,] I abide by the laws of this state and this county[,] so the point is to find the truth, but in my heart and searching my soul I am still going to vote for a life sentence due to the fact if, you know, the defendant is guilty or even if he is not[,] the point is[,] from what I gathered so far by the change of his name[][5] he is of a Moslem descent ... *714 and what I know of the Moslems is that death isn’t that big of a deal. The penalty of death, to be killed[] is not that big of a deal.
Me as a Christian faith I have learned that him living a life, giving of himself to someone else to better their life is more of a punishment and a learning system for him than to take his life.
(Emphasis supplied.) This was the only reference during voir dire to the Muslim faith. Trial counsel did not move to strike the entire jury panel in response to the comment; however, the prospective juror did not serve because of his statement that he could not impose a sentence of death for any reason.
We have explained that “[a] venire member’s expression of an opinion before the entire panel is not normally considered sufficient to taint the remainder of the panel.” Johnson v. State, 903 So.2d 888, 897 (Fla.2005) (citing Brower v. State, 727 So.2d 1026/ 1027 (Fla. 4th DCA 1999)). McCoy has failed to establish that the prospective juror’s statements tainted the entire jury, such that trial counsel should have moved to strike the entire venire. First, we note that after the prospective juror made the comment, not a single juror referenced or inquired into McCoy’s religion, i.e., whether he was a member of the Islamic faith. Second, as noted by the postconviction court in its order, McCoy’s trial occurred prior to the September 11, 2001, terrorist attacks. Even after those attacks, two federal courts have held that the simple reference to a defendant either as a Muslim or by his Muslim name was insufficient to taint a jury or compromise a trial. See, e.g., United States v. Malik, 241 Fed.Appx. 873, 875-76 (3d Cir.2007) (holding that the government’s referral to defendant as “the Muslim guy” thirteen times before counsel objected did not require a mistrial); Mack v. Cain, 2008 WL 1901715, at *9 (W.D.La.2008) (challenge to prosecutor’s referral to defendant by his Muslim name “necessarily implies that 9/11 had so prejudiced the jurors that they were biased against all Muslims regardless of their race, national origin, allegiance, or non-involvement in the attacks. By the time of the May 2002 trial [in Mack ], some eight months had passed since 9/11, and [this court] simply cannot ascribe such irrational prejudice to the jurors.”).
The prospective juror’s assertions about McCoy’s name change and tenets of the Muslim faith constituted unsubstantiated opinions — not details presented and asserted as true by the prosecutor. As noted by the Fourth District Court of Appeal in Brower, “[prospective jurors are frequently exposed, before and during voir dire, to innumerable comments, attitudes, and points of view, the subscription to which would be improper for an unbiased juror.” 727 So.2d at 1027. Were excusal of an entire panel required for every allegedly biased or improper comment by a prospective juror, selecting a jury in a case — especially a capital case — would be exceedingly difficult. Thus, we agree with the postconviction court’s determination that trial counsel was not deficient for failing to request that the entire venire be struck, and this subclaim of ineffectiveness fails.
Concession that a Robbery Occurred
In his third claim, McCoy contends that trial counsel was ineffective for conceding during voir dire that a robbery of *715 the ABC Liquors store had occurred. Trial counsel stated to the venire: “[T]here is no question ... that there was a robbery and that there was a murder. The issue in this trial will be is [McCoy] the one who did it, have they arrested the right guy or the wrong guy.”
When asked during the evidentiary hearing why he conceded that a robbery had occurred, trial counsel offered a detailed explanation:
[There] was a tape, number one, of someone in the store who didn’t appear to be an employee leading someone who appeared to be the employee around the store. There was testimony that there was money missing from the store.... It looked like a crime on the tape. A robbery, of course, requires something to be taken, and I guess the key was testimony that money was missing.
[[Image here]]
[Y]ou have to make decisions to make the defense that you have the most persuasive that you can, and I think you lose points with the jury on the main issue if you contest those issues which you don’t have a good argument on. In looking back on the ease, I think that to argue it wasn’t a robbery is a weak argument. To argue that it wasn’t Mr. McCoy who did this is a somewhat stronger argument. It’s all we had. And you just — you want to keep your argument — your main argument as strong as you can and not lose credibility with the jury.
In denying this claim, the postconviciton court concluded that trial counsel’s actions constituted a reasonable tactical decision. We agree.
In Belcher v. State, 961 So.2d 239, 249 (Fla.2007), trial counsel made the following comments during opening statements:
Obviously, and quite tragically, Ms. Em-bry is dead. There’s no dispute about that.... [A] lot of the evidence that you’ll be hearing will be important for your consideration. But the evidence, that kind of evidence, will not show you what the ultimate question is. It won’t answer the ultimate question for you, which is who did it. And that’s what you need to be concerned with.
In holding that trial counsel was not ineffective for conceding that the victim was deceased, this Court noted that during the evidentiary hearing, trial counsel explained “his strategy in the opening statement was to build credibility with the jury by not disputing the fact that the victim was dead.” Id. We concluded that trial counsel’s actions constituted a strategic decision which “provides no basis for an ineffectiveness claim.” Id.
In the instant case, a video of the crime was played for jurors. It reflects someone leading the victim — the store manager— through the store. While in the store office, someone appears to bend down in the area of one of the store safes. Someone also walks over to a bag in which the ABC Liquors store pouches are delivered. After exiting the office, the victim and the intruder proceed to the cash registers and then enter the storeroom, where the victim is later found dead. The intruder exits the storeroom alone. The regional manager for ABC Liquors testified during trial that $415 was missing from the store’s two safes.
Given that trial counsel’s theory of the defense was that McCoy had an alibi for the time of the murder, we conclude that it was a strategic decision to concede that a robbery had occurred. See generally Occhicone, 768 So.2d at 1048 (“strategic decisions do not constitute ineffective assistance of counsel”). In light of the previously discussed evidence presented at trial, it would have been a weak argument to assert that no robbery of the ABC Liquors store occurred. For trial counsel *716 to present such an argument likely would have caused the defense to lose credibility with the jury. Because counsel-will not be deemed deficient for making a strategic decision to maintain credibility with a jury, this claim of ineffectiveness fails. .See Hutchinson v. State, 17 So.3d 696, 702 (Fla.2009).
Decision to Testify During Trial
McCoy next contends that trial counsel was ineffective for failing to warn him about the dangers of testifying on his own behalf. During trial, counsel attempted to cross-examine. Zsa Zsa Marcel about her purported involvement in the robbery of Lee’s Chicken restaurant. He also sought to have two witnesses to the restaurant robbery identify Marcel as the perpetrator. Trial counsel’s reason for seeking to question Marcel and these two other witnesses was to demonstrate “that [Marcel] had a motive to rat on [McCoy] before he rat[t]ed on her and to make up a story that he had committed this robbery at the ABC Liquors, so it goes to her motive and bias, her interest in making him a non-credible witness by becoming a witness against him in the ABC case.”
The trial court refused to allow counsel to question Marcel about the Lee’s Chicken restaurant robbery on cross-examination as a State witness, but stated that trial counsel could present her as a defense witness if McCoy were to first testify about her confession to him that she robbed the restaurant. The trial court’s explanation for this ruling was as follows:
My concern is what if we go through all of this great exercise and we put [Marcel] on trial for the armed robbery and we have all the people testify and all that kind of stuff and your client decides he doesn’t want to testify what have we done at that point?
[[Image here]]
We have created a mistrial because we have introduced gobs of totally irrel-
evant and very damaging evidence for the state that is totally irrelevant because there is at that point no evidence that she told him about [the restaurant robbery].
[[Image here]]
So I have a suspicion that if you are entitled to put this on at all you would only be entitled to put it on in your case and only then after you have had [McCoy] testify that [Marcel] confessed this to him which then makes it become relevant.
... I am not inclined to let all — let this secondary trial go on unless and until it becomes record evidence that [McCoy] knew about it and that [Marcel] knew anything about it.
McCoy testified, but before he did so, the trial court conducted the following colloquy:
COURT: Mr. McCoy, do you understand, sir, that in this trial you have the absolute right to testify and you have an equally absolute right not to testify?
MCCOY: Yes, sir.
COURT: And do you understand that the decision with regard to whether or not you testify must be yours and yours alone?
MCCOY: Yes, sir.
COURT: Are you satisfied, sir, that the defense that I have just been told . about that you wish to testify is your decision and yours alone?
MCCOY: Yes, sir, it is.
COURT: Would I be correct then in assuming that no one has forced you to testify and no one is compelling you in this case to testify?
MCCOY: No, sir. No one is compelling me to testify, sir.
COURT: Okay. And you have been advised of the consequences of testifying such as being cross examined about pH- *717 or felony convictions and the like, is that right?
MCCOY: Yes, sir, I have.
COURT: And are you satisfied taking all those things in balance that it’s in your best interest to testify in the case?
MCCOY: For the truth to come out, yes, sir.
COURT: All right. Thank you.
(Emphasis supplied.) McCoy testified that Marcel confessed to him she had robbed Lee’s Chicken restaurant. McCoy admitted that it was his voice on the recorded conversation that was played for the jurors, but testified that he lied to Marcel about being involved in the ABC Liquors robbery in an attempt to “impress” her because he saw that “this is the kind of lifestyle she was ... into.”
With regard to the ABC Liquors pouch that was discovered in the store office after the murder, the following dialogue occurred during cross-examination as to why McCoy’s fingerprints were on that pouch:
PROSECUTOR: You said you have been to that ABC two times?
MCCOY: Yes, sir.
PROSECUTOR: They ever let you into the office to touch one of these [pouches]?
MCCOY: I ran across one of those [in] April of 2000.
PROSECUTOR: You ran across one?
MCCOY: Yes, sir, I did.
PROSECUTOR: Where was that?
MCCOY: The ABC Liquors on Roosevelt. I was coming from the Days Inn hotel next to the dog track on Orange Park on the 8th of April. I had a flat tire. I pulled over and changed my tire.
[[Image here]]
It was in the parking lot. Nothing was in it and it was unzipped and I did touch it and I mailed it in.
McCoy testified that on April 7, 2000 (more than one month before the robbery/murder), he spent the night with a woman named Gwendolyn Brown at the Days Inn in room 112. He left the next morning without Ms. Brown, and thereafter discovered the pouch in the parking lot of a different ABC Liquors store than the one where the robbery/murder occurred. The State subsequently presented the guest services manager for the Days Inn referenced by McCoy in his testimony. The manager testified that on April 7, 2000, room 112 was reserved by a woman named Betty White.
During the evidentiary hearing, trial counsel explained his rationale for having McCoy testify: “[I]f you’re raising an alibi, which is what we were doing, it helps to have the defendant explain where he was at the time of the crime. If they have your fingerprints on the bank bag, it can help to try and give an explanation for why the fingerprints are there.” Nonetheless, trial counsel explained that he always leaves the decision whether to testify up to the client.
The decision as to whether McCoy would testify had not been established or determined prior to trial. With regard to that issue, the following discussion occurred during the evidentiary hearing:
STATE: All right. You were asked some questions ... regarding the defendant’s decision to testify. And you said this was a difficult case. Did you mean for the defense when you said that?
TRIAL COUNSEL: Yeah.
[[Image here]]
STATE: Did you, as best you could, in your professional judgment and experience, discuss that decision with Mr. McCoy prior to his colloquy with Judge Dearing about testifying?
TRIAL COUNSEL: I don’t have a specific memory of it as I sit here and I *718 ..didn’t see notes about it in the notes that I reviewed, but that has always been my practice.
[[Image here]]
And I specifically remember at some point, whether it was during trial or before trial, telling Mr. McCoy that explanation of the fingerprint was going to be very hard.
STATE: And, in fact, would it not be your practice to discuss the defendant’s right to testify with him on multiple occasions prior to a capital case?
TRIAL COUNSEL: Oh, yeah.
(Emphasis supplied.)
Trial counsel acknowledged that McCoy’s admission that the fingerprints on the pouch were his undermined the defense’s efforts to discredit the State fingerprint expert. With regard to McCoy’s testimony that he found the ABC Liquors pouch in a parking lot, the evidentiary transcript reflects:
POSTCONVICTION COUNSEL: When you told [McCoy] we need to have an explanation for your fingerprints found on the receipt bag—
[[Image here]]
—prior to trial or during trial, did he offer you an explanation, prior to testifying, if you can recall.
TRIAL COUNSEL: I can’t recall. ... I know for sure that some of the details that came out in his testimony were new to me, [6]but I can’t remember , how many of them are. •
POSTCONVICTION COUNSEL: Well, let me ask you about the details he testified to in his trial testimony to the effect that he found the bag in a parking lot and mailed it back to ABC. Do you recall that?
TRIAL COUNSEL: I recall that trial testimony. I’d have to look at my notes to see if it was told to me in that way at anytime in the past.
POSTCONVICTION COUNSEL: Did you ever discuss whether you thought that was a good explanation or not? Not suggesting that you can change his testimony, but when he told you that, whether or not that might be something — if that’s what your explanation is, maybe we just won’t present it.
TRIAL COUNSEL: ... Normally when I talk to a client I take notes and I jot down things about what we talk about. I’ve not seen that in these notes that I reviewed.
(Emphasis supplied.)
McCoy testified during the evidentiary hearing that he did inform trial counsel as to why his fingerprints were on the ABC Liquors pouch, but trial counsel never discussed this explanation with McCoy before he testified. In denying this claim, the postconviction court concluded that the testimony of trial counsel was more credible than that of McCoy, and that counsel did advise McCoy of the consequences of testifying.
• This issue amounts to a matter of witness credibility. Trial counsel testified that as a matter of course he discusses with a defendant the decision to testify on multiple occasions. Conversely, McCoy contended that no such discussion occurred during his capital case. We have explained that “[a]s long as the trial court’s findings are supported by competent substantial evidence, ‘this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by *719 the trial court.’ ” Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997) (quoting Demps v. State, 462 So.2d 1074,1075 (Fla.1984)); see also Cox v. State, 966 So.2d 337, 357-58 (Fla.2007) (noting that the trial court is frequently in a superior position to evaluate the testimony based upon its observation of the bearing, demeanor, and credibility of witnesses).
Here, the postconviction court concluded that trial counsel was the more credible witness and accepted his testimony. This decision is supported by the fact that the trial court conducted a colloquy with McCoy to determine whether the decision to testify was his own. During that colloquy, McCoy himself admitted that he had been advised of the consequences of testifying, and he concluded that testifying was in his best interest. Further, during the evidentiary hearing, McCoy acknowledged that the trial court cautioned him that if he testified, he would be subject to cross-examination. Based upon these ac-knowledgements by McCoy during both trial and the evidentiary hearing, we conclude that the postconviction court’s finding of credibility is supported by competent, substantial evidence. This finding refutes the assertion that trial counsel failed to advise McCoy of the consequences of testifying, and therefore, we reject this claim of ineffectiveness.
Failure to Present Zsa Zsa Marcel and Other Witnesses to Impeach her Testimony
The background for this challenge is complex and rather unique. The post-conviction court’s order provides a comprehensive summary:
Prior to trial, defense counsel had reason to believe that Ms. Marcel was involved in the Lee’s Chicken robbery. Defense counsel filed a motion to compel investigation of Ms. Marcel and argued that the State’s refusal to investigate her was a deliberate attempt to prevent the defense from impeaching her with pending charges. Defense counsel requested that this Court either dismiss the charges against the Defendant or prohibit Ms. Marcel from testifying during the trial.
The detective investigating the Lee’s Chicken robbery conducted a photo lineup, which included Ms. Marcel’s photo, but the victims were unable to identify her as the perpetrator. Defense counsel sent his investigator to interview an employee from Lee’s Chicken, who stated that the perpetrator was a woman -with a scar on her neck. Defense counsel’s investigator showed a photograph of Ms. Marcel to two other victims of the Lee’s Chicken robbery and they thought that she could have been the perpetrator, however, they wanted to see her in person and look at her neck before they would positively identify her.
Defense counsel requested that Ms. Marcel be presented to the victims of the Lee’s Chicken robbery. Defense counsel argued that Ms. Marcel had motive to lie because if the Defendant was convicted in this case, he would not be a credible witness against her in any prosecution for the Lee’s Chicken robbery. Defense counsel further argued that the State’s refusal to investigate the Lee’s Chicken robbery was distorting the fact finding process. The State asserted that there was not enough evidence to charge Ms. Marcel. This Court denied defense counsel’s motion, finding that there was no prosecutorial misconduct and that the State’s actions were reasonable.
At trial, during Ms. Marcel’s cross-examination, defense counsel attempted to ask her if she told the police about the Defendant’s involvement in the ABC Liquors robbery and murder because she was afraid that he would turn her in *720 for a crime. The State objected. At sidebar, defense counsel argued that he was going to try to show Ms. Marcel’s bias and to try and prove that she had a motive for turning the Defendant in.
Defense counsel then proffered questions to Ms. Marcel. During the proffer, Ms. Marcel testified that she did not implicate the Defendant out of fear that he would turn her in for a crime she committed. Ms. Marcel testified that she did not confess her involvement in the Lee’s Chicken restaurant robbery to the Defendant. Ms. Marcel further testified that her purpose in wearing a turtleneck to court was not to cover the scar on her neck.
Defense counsel proffered the rest of his argument outside the presence of Ms. Marcel. Defense counsel had two victims of the Lee’s Chicken restaurant robbery in the hall outside of the courtroom to attempt to identify Ms. Marcel. Defense counsel instructed the victims to pay careful attention to every African American female who walked by. One of the witnesses wanted to see Ms. Marcel’s neck. The other witness stated that Ms. Marcel had the same build, mannerisms, and features as the perpetrator, but noted that she was wearing a turtleneck and that he wanted to see if she had the birth mark on her neck. Defense counsel was concerned that another Lee’s Chicken restaurant employee ... had alerted Ms. Marcel to defense counsel’s attempt to have her identified in the courthouse and, therefore, Ms. Marcel attempted to disguise herself. Defense counsel requested that this Court allow him to ask Ms. Marcel to show her neck to the jury and the audience. This Court noted that if Ms. Marcel was put on secondary trial regarding the Lee’s Chicken robbery, and the Defendant chose not to testify regarding her confession, then a mistrial would result, as irrelevant and damaging evidence would have been introduced. This Court stated that once the Defendant testified regarding the confession, then defense counsel could continue this cross-examination of Ms. Marcel.
[FN] Although this witness referred to the mark on Ms. Marcel's neck as a birth mark, the remainder of the record refers to it as a scar.
Defense counsel stated that he planned to put the Defendant on the stand. Defense counsel stated that he would not call the Lee’s Chicken restaurant robbery victims to testify unless they could identify Ms. Marcel. The State and defense counsel conducted redirect and re-cross and then Ms. Marcel was allowed to step down, but was kept under subpoena.
When court reconvened the next morning, Ms. Marcel returned and was not wearing a turtleneck. Defense counsel stated that he wanted the two witnesses to look at Ms. Marcel’s neck and noted that if they did not make an identification, he could not make an argument to put them on the stand. Defense counsel suggested that Ms. Marcel be asked if she would allow the witnesses to look at her neck. This Court stated that it would not ask her, but defense counsel could ask her. Defense counsel then requested this Court’s assistance in procuring the identification of Ms. Marcel and asked that this Court direct the two witnesses to view Ms. Marcel close enough to see the scar on her neck. This Court did not grant defense counsel’s request, but did allow time for defense counsel to have the witnesses identify Ms. Marcel. The witnesses did not want to do so and they left.
(Citations to record omitted.)
Although Marcel was not presented as a defense witness, during closing statements *721 trial counsel addressed her potential bias in testifying against McCoy:
Well, then there is another reason you may want to distrust what Zsa Zsa Marcel says. Mr. McCoy testified that Zsa Zsa confessed to him that she had robbed Lee’s Chicken on June the 10th just three days before this homicide, so she perhaps had another reason that she would want Mr. McCoy out of the picture because she would tell a lie about him before he could turn her in for something he knew that she had done, and ... you know from the testimony she has got a scar on her neck. For some reason when she came in here and testified she wore a turtle neck and she wore a wig....
Failure to Present Marcel as a Defense Witness — Trial counsel offered the following explanation as to why he did not present Marcel as a defense witness:
[W]e were trying to discredit [Marcel], but — and I don’t remember what my thinking was at the time, but right now my thinking would be why call her back, she’s just going to deny it, she’s going to say no, and what I already had in the record was obvious evasion by her by wearing a wig and wearing a turtleneck and I had Mr. McCoy saying that she admitted [her involvement in the robbery] to him so I’ve got things in the record that are not controverted. If I call her back and [she says] no, that’s crazy, I didn’t do that, then I’ve got something that is controverted rather than something that is unrebutted.
The postconviction court denied this ineffectiveness subclaim on the basis that trial counsel made a tactical decision not to present Marcel as a defense witness.
This Court has previously held that “the strategic decision of trial counsel not to present a certain witness does not constitute ineffective assistance of counsel if that decision was the product of a reasonable trial strategy.” Taylor v. State, 87 So.3d 749, 768 (Fla.2012). During trial, counsel questioned Marcel out of the presence of the jury, and it became clear that Marcel would not concede her participation in the robbery or that she confessed same to McCoy:
TRIAL COUNSEL: Ms. Marcel, isn’t [it] true that you told the police this story about Mr. McCoy partly because you were afraid that he would turn you in for a crime that you committed?
MARCEL: No.
TRIAL COUNSEL: Isn’t it true that a few days before June the 13th of 2000 you confessed to Mr. McCoy that you had robbed the Lee’s Chicken on San Juan Avenue and you had shot a man?
MARCEL: No, I didn’t.
TRIAL COUNSEL: Isn’t it true you were afraid that he would turn you in so you told the police that he did this crime at the ABC?
MARCEL: No.
This proffer reveals that, even if trial counsel had presented Marcel as a witness, she would have only contradicted McCoy’s testimony. Counsel’s decision not to present Marcel so that McCoy’s testimony with regard to her involvement in the Lee’s Chicken robbery remained unrebutted constitutes a matter of trial strategy. Because “strategic decisions do not constitute ineffective assistance of counsel,” this sub-claim fails. Occhicone, 768 So.2d at 1048; see also Taylor, 87 So.3d at 763.
Failure to Present the Witnesses of the Lee’s Chicken Robbery — When asked by postconviction counsel why he waited until mid-trial to attempt to have the Lee’s Chicken witnesses identify Marcel, trial counsel testified that McCoy first notified him of Marcel’s alleged participation in the robbery in August 2000, approximately nine months before the trial. Trial coun *722 sel was unable to recall how long after McCoy’s revelation it was before he was able to pinpoint the robbery and then locate the witnesses. However, counsel knew that he worked on this issue prior to trial because, otherwise, the witnesses to the robbery would not have appeared at the courthouse. On cross-examination, trial counsel conceded that Marcel’s purported involvement in the Lee’s Chicken robbery would not have changed the fact that McCoy’s fingerprints had been located on an ABC Liquors pouch discovered at the crime scene. The postconviction court denied this claim, concluding that trial counsel “made diligent attempts to procure the identification of Ms. Marcel and have the victims of the robbery testify.”
Neither of the witnesses to the Lee’s Chicken robbery who appeared at the courthouse during McCoy’s trial testified during the evidentiary hearing. As such, there has never been a definitive identification of Zsa Zsa Marcel as the person who robbed the restaurant and shot the manager. Counsel even admitted during trial that if the witnesses could not identify Marcel as the perpetrator, he had no reason to present them as part of McCoy’s defense. Thus, there is no definitive evidence that, had these witnesses testified, they would have corroborated McCoy’s testimony that Marcel robbed the Lee’s Chicken restaurant and demonstrated her bias in testifying for the State. On this basis alone, we hold that McCoy has failed to demonstrate he was prejudiced by trial counsel’s performance.[7]
Further, the postconviction court’s description of the facts surrounding this issue demonstrate that trial counsel diligently and repeatedly attempted to have the Lee’s Chicken robbery witnesses identify Marcel as the perpetrator. During the State’s case, McCoy’s counsel asked the trial court if it would allow him to ask Marcel
to show her neck to the jury and to the audience and allow the two witnesses that we have out in the hall into the courtroom so they can look at her neck. I know that’s unusual but, Your Honor, I have got no way to prove that she did this robbery unless the two eye witnesses [sic] to the robbery can look at her, and there is no other way they are going to be able to look at her....
The trial court denied the request, stating that only if McCoy first testified as to what Marcel allegedly told him about the Lee’s Chicken robbery would this evidence possibly be admissible.
During the defense’s case, the trial court refused counsel’s request to compel the witnesses to “view Ms. Marcel from a distance close enough that they can see the scar on her neck.” The trial court stated, “I do not consider that I have the jurisdiction to compel subpoenaed witnesses to go outside of the courtroom and conduct any investigation of their own.” The trial court did afford counsel time to have the victims look at Marcel if they were willing to do so. That viewing did not occur because, as stated by trial counsel:
*723 [T]he witnesses were advised by ... the Justice Coalition not to walk down and look at Ms. Marcel, and I asked them — I told them I couldn’t compel them. I told them what the Court said and I think they have left now. They don’t want to do it.
Given these diligent — albeit unsuccessful — efforts to have the witnesses to the Lee’s Chicken robbery identify Marcel, we conclude that the performance of trial counsel was not deficient. In further support of our conclusion is the fact that postconviction counsel failed to present any evidence to indicate that trial counsel was remiss or untimely in locating the witnesses.
In light of the foregoing, we affirm the decision below and reject McCoy’s claims of ineffectiveness under this issue.
Cumulative Error
When a defendant fails to prevail on any individual claim of ineffectiveness, a claim of cumulative error cannot succeed. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003). Because we have rejected each of McCoy’s allegations of ineffectiveness, he is not entitled to relief under this claim.[8]
Ring Claim
In his final claim, McCoy contends that Florida’s capital sentencing structure violates the holding of the United States Supreme Court in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In support of this claim, McCoy relies upon Evans v. Secretary, Florida Department of Corrections, Case No. 08-14402-CIV-MARTINEZ, 2011 WL 9717450 (S.D.Fla. June 20, 2011), in which the United States District Court for the Southern District of Florida held that Florida’s capital sentencing scheme does not comply with constitutional jury trial requirements and violates Ring.
In his direct appeal, McCoy raised multiple constitutional challenges to the death penalty in Florida. One such challenge asserted that “The Florida Death Penalty Statute is Unconstitutional Because the Decision as to ‘Life’ or ‘Death’ is made by a Judge, Rather than a Jury.” Under this subheading, McCoy contended that Florida’s capital sentencing structure violates the right to trial by jury under the Sixth Amendment. In affirming McCoy’s death sentence, we rejected all challenges to Florida’s death penalty statute:
Having examined his assertions, we conclude that each of them has failed in previous cases before this Court, and McCoy advances no basis to justify revisiting settled jurisprudence. Of note, McCoy has asserted that Florida’s capital sentencing scheme violates both the United States and Florida Constitutions under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. We conclude that McCoy is likewise not entitled to relief on this claim.
McCoy, 853 So.2d at 409. Accordingly, this challenge is both procedurally barred and without merit. See Ferrell v. State, 918 So.2d 163, 178 (Fla.2005) (holding that issues raised and rejected on direct appeal are procedurally barred in a postconviction proceeding).
*724 Moreover, although the United States District Court for the Southern District of Florida previously held that Florida’s capital sentencing statute violates the Sixth Amendment, that decision has now been reversed by the United States Court of Appeals for the Eleventh Judicial Circuit. See Evans v. Sec’y, Fla. Dep’t ofCorr., 699 F.3d 1249, 1265 (11th Cir.2012), petition for cert, filed, No. 12-11 (U.S. Mar. 18, 2013). Thus, federal precedent does not support McCoy’s claim for relief.
CONCLUSION
For the foregoing reasons, we affirm the denial of McCoy’s rule 3.851 motion.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result.

. McCoy inadvertently marked this claim as number 22. Claims 20 and 21 do not exist in the motion.

. Huff v. State, 622 So.2d 982 (Fla.1993).

. McCoy’s mother did not testify during the evidentiary hearing due to illness.

. There was also a second VCR in the store office that was hidden in a locked cabinet. The visible VCR recorded from a camera that was positioned toward the drive-through window. The hidden VCR recorded from a camera that was positioned toward the store lobby. Detective Gilbreath testified that the display counter on the VCR secured inside the locked cabinet was moving.

. During voir dire, the trial court advised the venire that McCoy had changed his legal name:
You have heard me refer to the defendant in this case by two names ... Jamil Rashid formally [sic] known as Richard Lee McCoy. *714 The indictment refers to the defendant by these two names.
Several years ago the defendant changed his legal name from Richard Lee McCoy to Jamil Rashid. [To s]ome people he is still known by his birth name, Richard Lee McCoy, and to some he is known by his new legal name, Jamil Rashid. Both names are included in the indictment so that there will be no confusion.

. The State relies upon this testimony to assert that McCoy’s explanation as to why his fingerprints appeared on the bank pouch was a total fabrication that caught trial counsel completely by surprise.

. Further, even if the witnesses to the Lee’s Chicken robbery had identified Marcel as the perpetrator, and even if we were to conclude that counsel was deficient for the failure to present these witnesses — which we do not— there is no reasonable probability that, but for this failure, the result of McCoy’s trial would have been different, and our confidence in the outcome has not been undermined. See Bradley, 33 So.3d at 672 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). As previously discussed, Marcel knew specific details about the crime before they were released to the media. Further, compelling evidence was presented to establish that McCoy was the perpetrator of the robbery and murder, including fingerprint evidence and a surveillance video of the crime.

. To the extent that this issue can be interpreted as a challenge to the sufficiency of the evidence, on direct appeal we held that sufficient evidence existed in the record to support McCoy’s conviction for first-degree murder. McCoy, 853 So.2d at 408. Accordingly, such a challenge would be both successive and without merit.